Report: CZR0026

**21ST JUDICIAL CIRCUIT**
**ST LOUIS COUNTY**
**CIRCUIT COURT DOCKET SHEET**

| | |
|---|---|
| Date: | 20-Nov-2012 |
| Time: | 2:21:26PM |
| Page: | 1 |

---

**12SL-CC04021**    **DANIEL RASKAS V JOHNSON & JOHNSON ET AL**    **Security Level: 1 Public**

| | | | |
|---|---|---|---|
| **Case Type:** | CC Other Tort | **Case Filing Date:** | 22-Oct-2012 |
| **Status:** | Pet Filed in Circuit Ct | | |
| **Disposition:** | | **Disposition Date:** | |

---

**Release/Status Reason**
**Change Date**

| | |
|---|---|
| Judge | BARBARA W WALLACE (27589) |
| Plaintiff | **DANIEL RASKAS (RASD*2560)** |
| Defendant | **JOHNSON & JOHNSON (JOHNSJOHN)** |
| | **MCNEIL-PPC INC (MCNEIL-PP)** |
| Attorney for Plaintiff | RICHARD S CORNFELD (31046) |

---

| **Filing Date** | **Description** |
|---|---|
| 22-Oct-2012 | **Judge Assigned**<br>DIV 13 |
| | **Confid Filing Info Sheet Filed** |
| | **Certificate of Service** |
| | **Pet Filed in Circuit Ct** |

## IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
## STATE OF MISSOURI

**DANIEL RASKAS,**

              **Plaintiff,**

v.

**JOHNSON & JOHNSON**

and

**MCNEIL-PPC, INC.,**

          **Defendants**.

Case No.

Div.

**JURY TRIAL DEMANDED**

*(handwritten)* 12SL-CC04021

*(stamp)* **13**

*(stamp, vertical)* 2012 OCT 22 PM 1:41

*(stamp, vertical)* JOAN M. GILMER CIRCUIT CLERK

*(stamp, vertical)* RECEIVED & FILED CIRCUIT COURT OF ST LOUIS COUNTY

---

### CERTIFICATE OF SERVICE

       The undersigned states that a true and correct copy of Plaintiff's First Request for Admissions Directed to Defendants; Plaintiff's First Set of Interrogatories Directed to Defendants; and Plaintiff's First Request for Production Directed to Defendants was included with the Petition and Summons, to be served with them, via U.S. mail, first class postage prepaid, on the following:

Johnson & Johnson
Serve: S. M. Rosenberg
      Registered Agent
      One Johnson & Johnson Plaza
      New Brunswick, N.J. 08933
      (732) 524-0400

McNeil-PPC, Inc.
Serve: % Johnson & Johnson
      Office of the Corporate Secretary
      One Johnson & Johnson Plaza
      New Brunswick, N.J. 08933
      (732) 524-0400

*(signature)*

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
STATE OF MISSOURI

**DANIEL RASKAS**

      **Plaintiff,**

**v.**

**JOHNSON & JOHNSON;**

Serve:  S. M. Rosenberg
        Registered Agent
        Johnson & Johnson
        One Johnson & Johnson Plaza
        New Brunswick, N.J. 08933
        (732) 524-0400

**MCNEIL-PPC, INC.;**

Serve:  Registered Agent
        ℅  Johnson & Johnson
        Office of the Corporate Secretary
        One Johnson & Johnson Plaza
        New Brunswick, N.J. 08933
        (732) 524-0400

      **Defendants.**

Case No. : 12SL-CC04021

Division.: **13**

2012 OCT 22  PM 1:41

JOAN M. GILMER
CIRCUIT CLERK

RECEIVED & FILED
CIRCUIT COURT OF
ST LOUIS COUNTY

## PLAINTIFF'S CLASS ACTION PETITION

      Plaintiff DAN RASKAS, on behalf of himself and all others similarly situated, brings this

action against JOHNSON & JOHNSON and MCNEIL-PPC, INC.(hereinafter referred to

collectively as "JNJ" or "Defendant"); and for his Petition, based upon personal knowledge as to

his own acts and upon information and belief (based on the investigation of counsel) as to all

other matters, alleges as follows:

### INTRODUCTION

    1.     With this lawsuit, Plaintiff challenges JNJ's unconscionable, unfair, deceptive,

unethical and illegal practice of misleading consumers into throwing away Tylenol Cold Multi-

Symptom solid medications ("the subject medications") once their so-called "expiration dates" have passed, even though JNJ knows, or should know, that if stored properly these medications can and do remain chemically stable, safe and effective long after those dates.

2.      On behalf of himself and similarly situated Missouri consumers, Plaintiff seeks damages and equitable relief, including an order compelling Defendants to provide consumers with accurate information regarding the meaning of the so-called "expiration dates" printed on the packages of the subject medications; to provide accurate information as to when these products are no longer safe and effective; and to tell consumers how to store these medications to extend their useful lives.

3.      The subject medications are available without a physician's prescription for the temporary relief of the symptoms of the common cold. As required by regulations promulgated by the United States Food & Drug Administration ("FDA"), every container of these medications displays a date, called an "expiration date." That date does not mean that the medication is unsafe or ineffective once the date has passed.

4.      FDA requires a manufacturer like JNJ to conduct testing to assure the stability of its drug products only up until a date of the manufacturer's own choosing, but not thereafter. That date becomes the so-called "expiration date." Upon information and belief, JNJ has never conducted testing that would show that, at any time after the "expiration date," the subject medications are not stable, safe or effective. Thus, JNJ has never told consumers the full period during which the subject medications will remain safe and effective.

5.      In fact, JNJ knows, or should know, that OTC medications such as the subject medications remain safe and effective long after their so-called "expiration dates." That is the

2

conclusion – to cite two examples – of Harvard Medical School and Johns Hopkins University School of Medicine, a conclusion based in part on testing by the federal government.

6.      As further evidence that JNJ knows that Tylenol OTC medications remain safe and effective after their expiration dates, JNJ publically informed consumers of some of its infant and children's medications that it was acceptable to take them when the "expiration date" on the container had become illegible – even though it knew that consumers might, as a result, provide them to their children after they had supposedly "expired." JNJ did so because it knew those medications would remain safe and effective. In addition, JNJ's industry associations have stated that medications remain effective long after their "expiration dates."

7.      Despite that knowledge, on its web sites and elsewhere, JNJ illegally deceives consumers into throwing away the subject medications as soon as the "expiration dates" have passed by misrepresenting those supposedly "expired" medications as unsafe and ineffective. JNJ also dupes consumers into believing that it is socially responsible – both to protect the environment and to prevent drug abuse – to throw away "expired" medications.

8.      The purpose behind this scheme is to increase JNJ's sales and profits because consumers have to purchase replacement medications for those they have thrown out.

9.      JNJ carries out this illegal scheme in a number of ways, both individually and collectively with other members of its industry. For example, JNJ not only makes affirmative misrepresentations about the need to throw away supposedly "expired" medications, but it fails to provide to consumers information that it knows, or should know, to be true and that would make the "expiration dates" not misleading, including that it chooses the so-called "expiration date" based on its own marketing considerations, not scientific reasons, and that the "expiration date" does not indicate how long the product is actually "good" or safe to use. Nor, among other

3

omissions, does JNJ state that consumers may continue to take the product as long as it works as expected and should discard it only if it loses effectiveness.

10.    JNJ conspires with other manufacturers of OTC medications to carry out this scheme by promoting disposal of supposedly expired medications through their industry associations, the Pharmaceutical Research and Manufacturers of America ("PhRMA") and the Consumer Healthcare Products Association ("CHPA").   These associations engage in supposed public service campaigns to mislead consumers into believing that it is socially responsible to throw away medications that have passed their so-called "expiration dates."

11.    By its actions in deceiving consumers into getting rid of medications that are still "good," JNJ has violated the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.* ("MMPA"), and engaged in an illegal civil conspiracy, causing injury to plaintiffs and the other members of the class.

## VENUE AND JURISDICTION

12.    The Circuit Court of St. Louis County has subject matter jurisdiction over this action because the actions complained of regarding Plaintiff took place in St. Louis County. V.A.M.S. 407.025.1.

13.    This court has personal jurisdiction over Defendant because it regularly conducts business in St. Louis County.

14.    Venue is proper in the Circuit Court of St. Louis County because the cause of action arose in St. Louis County.  V.A.M.S. 407.025.1.

## PARTIES

15.    Plaintiff Dan Raskas is, at all times relevant hereto, a resident of St. Louis County who purchased, for personal, family or household purposes, the subject medications and

4

who discarded and replaced them after the "expiration dates" even though there was medication remaining.

16.     Johnson & Johnson and its subsidiary McNeil-LLP are New Jersey corporations that manufacture, market, advertise and sell the subject medications throughout the United States, including Missouri.   JNJ claims to operate according to a "Credo" that "challenges us to put the needs and well-being of the people we serve *first*."[1]  The products regarding which it purportedly does so include the subject medications.  JNJ does substantial business within the State of Missouri through its sale of the subject medications within the State.

## FACTUAL BACKGROUND

**A.     The so-called "expiration date" mandated by government regulations does not indicate how long the product remains stable, safe and effective**

17.     FDA regulations require that manufacturers of OTC medications include a date, called an "expiration date," on the immediate container as well as the outer package of the product.  21 C.F.R. §§ 211.137(b), 201.17.

18.     Manufacturers of OTC medications are required to have a written testing program designed to assess the stability characteristics of their drug product in its original packaging and to use the results of such testing in determining the so-called "expiration date" of the product.  21 C.F.R. § 211.166.  But nothing in the regulations determines the precise shelf life that the manufacturers must test; the "expiration date" is therefore subject to the manufacturer's unilateral decision.

---

[1] www.jnj.com/connect/about-jnj/ (October 11, 2012) (emphasis in original).

19.    Nor do the regulations prevent manufacturers from conducting tests to determine how long the products remain stable. However, on information and belief, JNJ tests the subject medications only up to the "expiration date" it chooses, but not beyond it.

20.    Moreover, on information and belief, JNJ tests the subject medications only in their sealed, original packaging under conditions likely to be encountered during shipping and storage at retail. It does not test them under conditions of storage in a typical consumer's home, such as in an intermittently hot and humid bathroom after the bottle's seal has been broken and the bottle has been opened. The regulations do not prohibit such testing.

21.    Nor does federal law govern when it is permissible for a consumer to take an OTC medication. The regulations control only the period when it can be sold.

22.    Thus, an "expiration date" is simply the manufacturer's representation that the medication will remain stable in the original sealed packaging until that date, but it says nothing about whether the medication will or will not remain stable beyond that date.

### B.    As JNJ knows or should know, its Tylenol Cold Multi-Symptom medications remain stable, safe and effective long after the "expiration dates" on their labels

23.    JNJ knows, or should know, that OTC medications remain stable and are safe and effective for consumers to use years after their "expiration dates."

24.    Beginning in the 1980s, the FDA conducted a program at the request of the United States military, called the "Shelf Life Extension Program" or "SLEP." The program was designed to keep the military from having to discard hundreds of millions of dollars' worth of supposedly expired stockpiled medicines. Under it, the FDA tested the stability of more than 100 prescription and OTC drugs.

25.    According to findings that, as described below, were later relied upon by physicians and scientists, 90% of the medications tested "were safe and effective far past their

6

original expiration date, at least one for 15 years past it." Laurie Cohen, *Many Medicines Are Potent Years Past Their Expiration Dates*, Wall Street Journal at A-1 (March 29, 2000).

26.     As a result of this program, the military stopped discarding supposedly "expired" medication and, its savings were huge.  During just five years in the 1990s, the program resulted in net savings of approximately $260 million from drugs that did not need to be destroyed and replaced. *Id.*

27.     The study found "that expiration dates put on by manufacturers typically have no bearing on whether a drug is usable for longer.... '[M]anufacturers put expiration dates on for marketing, rather than scientific reasons'.... 'It's not profitable for them to have products on a shelf for 10 years.  They want turnover.'" *Id.* (quoting Francis Flaherty, former director of the SLEP testing program).

28.     The study also found that, but for exceptions like nitroglycerin, insulin and some liquid antibiotics – none of them subject to Plaintiff's claims herein – "[m]ost drugs degrade very slowly.... In all likelihood, a product at home can be kept for many years, especially if it's in the refrigerator." *Id.* (quoting Joel Davis, former FDA expiration-date compliance chief).

29.     The findings came as a revelation to Army Col. George Crawford, a pharmacist, who took over the program in 1997.  According to him, "nobody tells you in pharmacy school that shelf life is about marketing, turnover and profits." *Id.*

30.     FDA found that most drugs have a 36-month "expiration date" from the date of manufacturing, a period that is based on the companies' commercial distribution practices and marketing strategies because they make money by turning over their product. *History of the U.S. Food and Drug Administration*, Interviewee:  Francis J. Flaherty, June 14, 2000, at 30. Manufacturers would use a shorter date if they could "get away with it." *Id.*

31.    FDA also found that drugs degrade only very slowly. They do so "on a curve; in most cases a long, slow curve." *Id.* at 31.

32.    The drug companies were well-aware of the SLEP program and never challenged the findings despite losing millions of dollars in sales as a result of it. *Id.* at 36. The SLEP program prevented the drug companies from "ripping off" the government by selling products with unrealistically short expiration dates. *Id.* at 36.

33.    Since the SLEP program came to light, many medical authorities have relied on it and other data to come to the conclusion that supposedly "expired" drugs, especially OTC medications taken for minor, non-life-threatening conditions, need not be discarded.

34.    On August 21, 2003, the Medscape website published an article titled, "Do Medications Really Expire?"[2]  Medscape is a website that "offers specialists, primary physicians, and other health professionals the Web's most robust and integrated medical information and educational tools." Its mission is "[t]o provide clinicians and other healthcare professionals with the most timely comprehensive and relevant clinical information to improve patient care."[3]

35.    Relying in part on the FDA's SLEP study, the Medscape article reported that the "expiration date" on a drug label "does not mean how long the drug is actually 'good' or safe to use." According to the article, drugs past their "expiration date" are not unsafe: "[M]edical authorities uniformly say it is safe to take drugs past their expiration date -- no matter how 'expired' the drugs purportedly are."

36.    The author of the Medscape article advised:

_____

[2]Richard Altschuler, *Do Medications Really Expire?*, http://www.medscape.com/viewarticle/460159 (accessed October 11, 2012; registration required).

[3] http://www.medscape.com/public/about (accessed October 11, 2012).

> Even 10 years after the "expiration date," most drugs have a good deal of their original potency. So wisdom dictates that if your life does depend on an expired drug, and you must have 100% or so of its original strength, you should probably toss it and get a refill, in accordance with the cliché, "better safe than sorry." If your life does not depend on an expired drug – such as that for headache, hay fever, or menstrual cramps – take it and see what happens.

*Id.*

37.     According to the author of the Medscape article, a four-year-old "expiration date" on his mother-in-law's Tylenol did not render it unsafe or ineffective. *Id.*

38.     The author concluded by referring to the "many billions of dollars the pharmaceutical industry bilks out of unknowing consumers every year who discard perfectly good drugs and buy new ones because they trust the industry's 'expiration date labeling.'" *Id.*

39.     Harvard Medical School has also come to the conclusion that drugs are not ineffective simply because the "expiration date" has passed.  The *Harvard Health Letter* has stated that expiration dates "serve more to protect the pharmacies and manufacturers than to tell you when your pills are no good."  Thomas H. Lee, *By the Way, Doctor – Are expired medications dangerous*, Harvard Health Letter (July 2003).  That article stated that drugs that are past the "expiration date" are neither harmful nor ineffective:

> There are two ways in which pills might "go bad."  Theoretically, the chemicals in a medication could break down into something that's harmful.  But cases of that actually happening are virtually unknown.  There was one report of an antibiotic that had degraded into a form that was harmful to the kidneys, but that antibiotic has been changed so this danger is practically nonexistent.
>
> The more important issue is whether pills lose their potency because they have been exposed to air, light, and moisture.  Sitting in their vials in a dry, dark place like a medicine cabinet, most pills will stay effective for at least five years.  Some medications have been shown to be stable as many as 30 years after they were made.

*Id.*

9

40.     Similarly, the *Harvard Medical School Family Health Guide*, relying on the Medscape article discussed above and the work that the FDA did for the military, came to this conclusion: "So the "expiration date" doesn't really indicate a point at which the medication is no longer effective or has become unsafe to use. Medical authorities state expired drugs are safe to take, even those that expired years ago.... Excluding nitroglycerin, insulin, and liquid antibiotics, most medications are as long-lasting as the ones tested by the military. Placing a medication in a cool place, such as a refrigerator, will help a drug remain potent for many years." *Drug Expiration Dates – Do They Mean Anything?*, The Harvard Medical School Family Health Guide (November 2003 Update).

41.     Johns Hopkins University School of Medicine has come to the same conclusion. Its web site, "Johns Hopkins Medicine Health Alerts," has reported that "expiration dates" are set very conservatively and are not the last date when drugs are effective:

> Think of expiration dates – which the U.S. Food and Drug Administration (FDA) requires be placed on most prescription and OTC medications – as a very conservative guide to longevity. ... Most medications, though, retain their potency well beyond the expiration date, and outdated medications, whether prescription or OTC, are not usually harmful.

Johns Hopkins Health Alert, *How Long Do Medications Last?*, April 21, 2009.

42.     Johns Hopkins also distinguished between drugs taken for serious diseases and OTC medications, like the ones at issue in this litigation, taken for a headache or hay fever. The article advised that patients should consider replacing the former but not OTC drugs: "Also, consider replacing any outdated medications that you're taking for a serious health problem, since its potency is more critical than that of an OTC drug you take for a headache or hay fever." *Id.* Contrary to that advice, JNJ tells consumers to throw away even OTC drugs.

43.    In addition, the nursing profession is also aware that medications need not be discarded after the "expiration date" has passed. In 2008, Amy M. Karsh, associate professor of clinical nursing at the University of Rochester, stated in the American Journal of Nursing:

> It seems reasonable to continue to use drugs past the stamped expiration date as long as caution is used with drugs that have a narrow therapeutic range, drugs in solution or suspension, nitroglycerin, tetracycline (Sumycin), and any drug that looks odd or develops a peculiar smell. (Aspirin, which is often stable for years after its expiration date, will start to smell like vinegar when it becomes unstable. It isn't toxic, but it will lack potency and should be discarded.)

Amy Karsh, *Waste Not?*, 108 Am. J. Nursing 86, 87 (2008). None of the types of drugs as to which she recommended using caution include the subject medications. *Id.*

44.    JNJ itself has admitted that the "expiration date" is not necessary for the safe and effective use of its Tylenol-brand products, even the infants' versions. In early 2010, it learned that certain product lots of Infants' Tylenol, as well as its Infants' Motrin, and its Children's Zyrtec, had the potential for the product lot number and/or "expiration date" printed on the bottle to become illegible as a result of consumer handling. As a result, consumers might not be able to determine the "expiration dates" of their medications and might therefore provide purportedly "expired" medications to their children. Nevertheless, JNJ did not recall any of these products from consumers.[4]

45.    On information and belief, the reason why JNJ did not conduct a consumer recall was not that it was unconcerned about the welfare of children taking its drugs. The reason was that it knew that the "expiration dates" were irrelevant to whether the drugs would remain stable, safe and effective and therefore an expensive recall was unnecessary. JNJ specifically told consumers: "There are no indications that the absence of these lot numbers and expiration dates will cause adverse events." *Id.*

---

[4] http://www.tylenol.com/page2.jhtml?id=tylenol/news/subp_infants_recall_news.inc (accessed October 11, 2012).

46.     JNJ's industry associations also acknowledge that OTC medications such as the subject medications remain effective long after their "expiration dates." PhRMA participates in, and CHPA is a supporter of, a campaign called "**SMAR**$_x$**T DISPOSAL.**" The web site of this campaign states that "if stored properly, medications can remain effective (biologically active) for months or even years after the expiration date."[5]

**C.     JNJ deceptively tells consumers to throw away Tylenol OTC medications, such as the subject medications. after their "expiration dates"**

47.     Despite claiming to live by a "Credo" that requires that it put the well-being of the people it serves first, JNJ misleads and deceives consumers into believing that supposedly expired OTC medications, including the subject medications, should be thrown away and that if they are not, the drugs will be unsafe and ineffective.

48.     For example, web pages for the subject medications contain "Frequently Asked Questions" that advise not taking these medications if they have passed their "expiration date." One such web page[6] states:

> Can I take TYLENOL® Cold Multi-Symptom Daytime if the expiration date has passed?
>
> Using products beyond their expiration dates is not recommended.

49.     JNJ maintains web pages for Tylenol entitled "Safe Disposal of Medicine" that state: "As part of our commitment to your safety, we are providing information and resources to

---

[5] http://www.smarxtdisposal.net/questions.html (accessed July 17, 2012).

[6] http://www.tylenol.com/print.jhtml?id=tylenol/cold/multisym_dn_faqprint.inc#s7 (accessed October 11, 2012).

help you dispose of unneeded *or expired* medications in the most appropriate way." Detailed

instructions on how to dispose of "expired or otherwise unneeded medication" follow.[7]

50.    JNJ publishes a monograph directed to healthcare professionals entitled

"TYLENOL Professional Product Information" so that healthcare professionals can "educate"

their patients about Tylenol-brand medications. That monograph misleadingly states that

Tylenol solid products are stable for three years from manufacture, thus falsely implying that

they are not stable after that point:

> Expiration Dating Periods for Commercially Available Products
>
> Under room temperature storage conditions, TYLENOL® acetaminophen solid
> formulations are generally stable for 3 years and liquid formulations are generally
> stable for 2 years from the date of manufacture. Refer to product package for
> specific expiration date.

*Id* at 5. The same passage is presented on a web page directed to healthcare professionals.[8] In

neither document does JNJ state that it has not tested Tylenol for longer periods. Nor does it

state what JNJ indicated in connection with the recall of children's Tylenol and other products,

namely that the "expiration date" is not necessary for the safe and effective use of the product.

51.    A Tylenol web page, directed to consumers, for Tylenol cold, allergy and sinus

products states: "*As long as your Tylenol products have not passed their expiration date*, they are

safe to take as directed."[9] This page clearly implies, misleadingly so, that the subject

medications are not safe to take if they have passed their "expiration date."

---

[7] http://www.tylenol.com/getreliefresponsibly/index.jhtml?id=tylenol/getreliefresponsibly/safe_disposal.inc
(accessed July 17, 2012) (emphasis added).

[8] http://www.tylenolprofessional.com/pharmacology.html (accessed October 11, 2012).

[9] http://www.tylenol.com/page.jhtml?id=tylenol/news/subrecent_changes.inc (accessed October 11, 2012) (emphasis
added).

52.    Each of the Tylenol packages, web sites and the JNJ publication described above omits the following material facts, which are necessary to make its representations regarding "expiration dates" not misleading:

- JNJ chooses the "expiration date" itself and chooses a date based on its own marketing considerations, not scientific reasons.

- The product will remain safe after the "expiration date."

- The "expiration date" does not indicate how long the product is actually "good" or safe to use.

- The product will remain effective for long periods after the "expiration date" if stored properly.

- Consumers may continue to take the product as long as it works as expected to relieve the consumers' symptoms and should discard it if it loses effectiveness.

- To increase the life of the product, consumers should store it in a cool, dry place and not keep it in a hot and humid bathroom.

53.    In addition, every subject medication sold in Missouri contains an "expiration date" but omits the information listed in the preceding paragraph, which is necessary to make that date not misleading.

54.    Another way that JNJ carries out this scheme is through its industry associations, PhRMA and CHPA.

55.    In the guise of protecting the environment, PhRMA's and CHPA's "**SMAR$_x$T DISPOSAL**" campaign encourages consumers to dispose of supposedly expired OTC medication. **SMAR$_x$T DISPOSAL** purports to provide consumers with "guidance on proper disposal of unused and *or expired* prescription and *OTC medications.*"[10] This web site preys

---

[10] http://www.smarxtdisposal.net/questions.html (accessed October 11, 2012) (emphasis added).

upon consumers' desire to be good environmental stewards to encourage them to get rid of, not just unneeded medications, but supposedly expired medications that are still safe and effective.

56.    As noted above, the **SMARₓT DISPOSAL** campaign (and JNJ through its participation in it) admits that medications remain effective long after their "expiration dates." Yet, inexplicably the web site states that this is a reason to throw away these effective medicines rather than continuing to use them.  Here is the complete question and answer containing this deceptive statement:

> I have medicines in my cabinet that expired months, or even years, ago. Can I just dump those down the toilet?
>
> The expiration date on medications is the date at which the manufacturer can still guarantee the safety and full potency of the medication.  However, if stored properly, *medications can remain effective (biologically active) for months or even years after the expiration date. Therefore, we also recommend you follow our SMARₓT DISPOSAL guidelines for disposing of expired medicines.* Important note: Never take an expired medication without checking with your pharmacist first.[11]

57.    This statement is clearly designed to deceive consumers into discarding perfectly safe and effective OTC medications.  If they were simply concerned about protecting the environment rather than increasing pharmaceutical sales, PhRMA, the CHPA, SMARₓT DISPOSAL and JNJ would state on this web site and elsewhere that consumers could safely continue to take their supposedly expired OTC medications and not throw them away until they are no longer needed or effective.

58.    PhRMA and CHPA also sponsor a campaign that purports to be designed to curb drug abuse, called "The American Medicine Chest Challenge."  This program preys on consumers' desire to prevent drug abuse in order to persuade them to dispose of, not merely unneeded medications or drugs of abuse, but supposedly expired OTC medications.

---

[11] http://www.smarxtdisposal.net/questions.html (accessed October 11, 2012) (emphasis added).

59.    On its web site, The American Medicine Chest Challenge invites consumers to "Take the American Medicine Chest Challenge ... in 5 Simple Steps." Two of those steps tell consumers that they should take an inventory of their OTC medicines and discard the ones that have supposedly "expired." Those two steps are:

> Take inventory of your prescription and *over-the-counter* medicine.

*    *    *

> Dispose of your unused, unwanted, and *expired* medicine in your <u>home</u> or at an American Medicine Chest Challenge Disposal site. [12]

60.    Moreover, CHPA maintains and makes publicly available on the internet a conduct code, called "Expiry Dating Code for OTC Drug Products," which states that the expiration date is "the date beyond which the drug product should not be used." In addition, the Code states "that consumers should, from time to time, review the contents of their OTC medicines [*sic*] inventory and discard products whose dates are past the expiration date fixed on the package."[13]

61.    These various industry web sites omit the following material facts:

- The manufacturer chooses the "expiration date" itself and chooses a date based on its own marketing considerations, not scientific reasons.

- The product will remain safe after the "expiration date."

- The "expiration date" does not indicate how long the product is actually "good" or safe to use.

- The product will remain effective for long periods after the "expiration date" if stored properly.

---

[12] http://www.americanmedicinechest.com/ (accessed October 11, 2012) (italic emphasis added).

[13] Expiry Dating Code for OTC Drug Products, found at http://www.chpa-info.org/scienceregulatory/Voluntary_Codes.aspx#expiry (accessed October 11, 2012).

- Consumers may continue to take the product as long as it works as expected to relieve the consumers' symptoms and should discard it if it loses effectiveness.

- To increase the life of the product, consumers should store it in a cool, dry place and not keep it in a hot and humid bathroom.

62.    JNJ has no legitimate reason for misleading consumers about expiration dates. Indeed, the reasons offered by the industry for not telling consumers that drugs remain safe and effective after they have supposedly expired or for failing to test them for longer periods do not hold up to analysis.

63.    In an article published on December 18, 2006, on the website redorbit.com, Alan Goldhammer, vice-president of PhRMA, offered, as the only reason why drugs may not be effective after the "expiration date," that "[m]any consumers keep their drugs in the bathroom, exposed to heat and humidity that degrade drugs."[14]

64.    This explanation was a sham as applied to the subject medications. On information and belief JNJ does not test the subject medications under high heat or humidity, and it does not advise consumers not to keep these medications in the bathroom.

65.    Moreover, to the extent, if any, that it significantly degrades an OTC drug if it is kept in a hot and humid bathroom, such conditions occur before as well as after the "expiration date" and render the "expiration date" on the package inapplicable to a consumer's use of the product. This only adds to the reasons why Defendant's misrepresentations regarding its "expiration dates" are false and misleading.

66.    Goldhammer also offered reasons why manufacturers do not test drugs for longer periods. Again his explanation was a sham. The article stated: "The industry calls the idea [of

---

[14] *Study Highlights Debate Over Drug Expiration Dates,*
http://www.redorbit.com/news/health/771253/study_highlights_debate_over_drug_expiration_dates/ (accessed October 11, 2012).

testing drugs for longer periods] a non-starter. Why would a company spend time and money

testing a drug's shelf life when its patent expires after a number of years, Goldhammer said.

Most medicines, he added, are given in quantities that should be taken fully to treat the illness,

with no leftovers."

67.    Neither reason has any validity as applied to the subject medications.

- Whatever the relevance of a product's patent protection is to a company's decision about shelf life, the issue does not apply to the drugs at issue here, which are not patented and which have generic equivalents on the market in the United States. Thus, there is no reason not to test the drugs for longer periods simply because they might come off patent.

- The drugs at issue here are not sold in quantities limited to treat a single illness with no "leftovers." They are for symptoms of the common cold, which generally recur. JNJ knows that. Otherwise there would be no reason to tell consumers to discard the drugs when they pass their "expiration dates."

68.    Because of Defendant's actions, consumers do not know precisely, or even

generally, how long the subject remain safe and effective. Thus, many consumers get rid of the

subject medications simply out of ignorance.

## CLASS ACTION ALLEGATIONS

69.    Pursuant to Mo. Rev. Stat. § 407.025.3(6) and Missouri Rule of Civil Procedure

52.08(b)(2) with respect to the claim for injunctive and declaratory relief, and pursuant to Mo.

Rev. Stat. § 407.025(7) and Missouri Rule of Civil Procedure 52.08(b)(3) with respect to the

claim for actual damages, Plaintiff seeks to represent the following Class

> All Missouri citizens who purchased Tylenol Cold Multi-Symptom solid medication for personal, family, or household purposes and later discarded and replaced it.

> Excluded from the proposed Class are Defendant, their Officers, Directors, and employees, as well as employees of any subsidiary, affiliate, successors, or assignees of Defendant. Also excluded is any trial judge who may preside over this case.

18

70.    The Class is believed to comprise numerous consumers, the joinder of whom is impracticable, both because they are geographically dispersed across the state and because of their number.

71.    Class treatment will provide substantial benefits to the parties and the Court. A well-defined commonality of interest in the questions of law and fact involved affect Plaintiff and the putative Class Members. Common questions of law and fact include:

A.    What is the basis for the "expiration date" of the subject medications?

B.    Is the "expiration date" of the subject medications the last date on which the medication is stable, safe and effective?

C.    Are the subject medications safe after their "expiration dates?"

D.    Are the subject medications effective after their "expiration dates?"

E.    Does JNJ choose the "expiration dates" of its the subject medications and does it choose dates based on marketing considerations, rather than scientific reasons?

F.    Does JNJ advise consumers to discard their subject medications after their "expiration dates?"

G.    Does JNJ advise consumers that it is unsafe not to discard the subject medications after their "expiration dates?"

H.    Is it deceptive for JNJ to advise consumers to discard their subject medications after their "expiration dates?"

I.    Is it deceptive for JNJ not to advise consumers that it chooses the "expiration dates" of its subject medications itself and chooses dates based on its own marketing considerations, not scientific reasons?

J.    Is it deceptive for JNJ not to advise consumers that their subject medications will remain safe after the "expiration dates?"

K.    Is it deceptive for JNJ not to advise consumers that their subject medications will remain effective for long periods after the "expiration date?"

L.    Is it deceptive for JNJ not to advise consumers that consumers may continue to take the subject medications as long as they remain effective and should discard them if they lose effectiveness?

19

M.     Is it deceptive for JNJ not to advise consumers that to increase the life of the subject medications, they should store them in a cool, dry place and not keep them in a hot and humid bathroom?

N.     Is it an unfair practice under the MMPA for JNJ not to inform consumers how long their subject medications can be expected to remain safe and effective in the consumer's home?

O.     What relief is appropriate to remedy JNJ's illegal conduct described herein?

72.     Questions of law and fact common to members of the Class, some of which are set forth above, predominate over any questions affecting only individual members of the Class. The resolution of common questions in this case will resolve the claims of both Plaintiff and the Class.

73.     Plaintiff's claims are typical of the claims of the proposed Class in that Plaintiff and the members of the class purchased the subject medication for personal or household use and later discarded it after the "expiration date" and replaced the medication.

74.     Plaintiff will fairly and adequately represent and protect the interests of the proposed Class. Plaintiff has no interests antagonistic to those of the Class. Plaintiff has retained competent and experienced counsel in the prosecution of this type of litigation.

75.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because members of the Class are numerous and individual joinder is impracticable. The expenses and burden of individual litigation would make it impracticable or impossible for proposed Class Members to prosecute their claims individually. Trial of Plaintiff's claims is manageable.

76.     Unless a class is certified, Defendant will continue to engage in unfair and deceptive practices and continue to commit violations of Missouri law, to the detriment of Plaintiff and proposed Class Members.

77.    Defendant has acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

78.    Plaintiff's claim for injunctive and declaratory relief on behalf of the Class is maintainable as a class action pursuant to Mo. Rev. Stat. § 407.025.3(6) and Missouri Rule of Civil Procedure 52.08(b)(2).

79.    Plaintiff's claim for actual damages on behalf of the Class is maintainable as a class action pursuant to Mo. Rev. Stat. § 407.025(7) and Missouri Rule of Civil Procedure 52.08(b)(3).

## JURY DEMAND

80.    Plaintiff demands a trial by jury on all issues so triable.

## COUNT I

## VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT

81.    Plaintiff incorporates by reference and re-alleges all preceding paragraphs of the Petition as though fully set forth herein.

82.    JNJ's web sites described herein, as well as the web sites maintained by its industry associations, as described herein, are advertisements as defined in the MMPA, Mo. Rev. Stat. § 407.010(1), because they are attempts by publication, dissemination, solicitation, circulation, or any other means to induce, directly or indirectly, consumers to enter or acquire any title or interest in any merchandise, specifically the subject medications.

83.    The subject medications are merchandise as defined in the MMPA, Mo. Rev. Stat. § 407.010(4), because they are objects, wares or commodities.

84.    Defendants are persons as that term is defined in the MMPA, Mo. Rev. Stat. § 407.010(4), because they are for-profit corporations.

21

85.    The sales by JNJ and the purchases by plaintiffs and the class members of the subject medications are sales as that term is defined in the MMPA, Mo. Rev. Stat. § 407.010(6), because they are sales of merchandise for cash or for credit.

86.    The advertising, offering for sale and sale of the subject medications by JNJ, as described herein, constitute trade or commerce as defined in the MMPA, Mo. Rev. Stat. § 407.010(4), because they directly or indirectly affect the people of this state.

87.    JNJ's actions described herein violate the MMPA in that they constitute deception, fraud, false pretense, false promise, misrepresentation, unfair practice and/or the concealment, suppression, or omission of material fact in connection with the sale of merchandise in trade or commerce, within the meaning of the MMPA.

88.    JNJ's actions described herein violate the MMPA because they constitute unfair practices as that term is defined in Mo. Code Regs. tit. 15, § 60-8.020. Specifically, they (a) offend the public policy as it has been established by the Constitution, statutes or common law of this state, and/or by the Federal Trade Commission, and/or its interpretive decisions and/or (b) are unethical, oppressive and/or unscrupulous. In addition, those actions present a risk of substantial injury to Plaintiff and the class, whose members are at risk of discarding safe and effective medication because of Defendant's actions as alleged herein.

89.    Plaintiff purchased the subject medications manufactured by Defendant and thereby suffered an ascertainable loss of money or property as a result of the use or employment by Defendant of the actions described herein by virtue of having discarded the subject medications after their "expiration dates" and spending money to replace them.

90.    The unlawful actions of Defendant alleged herein caused similar injury to the other members of the Class.

91.    Injunctive relief is necessary to protect Plaintiff and the members of the Class from Defendant's unlawful acts.

## COUNT II

## CIVIL CONSPIRACY

92.    Plaintiff incorporates by reference and re-alleges all preceding paragraphs of the Petition as though fully set forth herein.

93.    JNJ engages in a civil conspiracy to deceive consumers into discarding and replacing safe and effective medications that have passed their "expiration dates" and to engage in the unfair practices described herein.

94.    JNJ and the other members of PhRMA and CHPA are members of the conspiracy.

95.    The conspiracy has the unlawful objective of deceiving consumers into believing that their supposedly expired OTC medications, including the subject medications, are neither safe nor effective, thereby inducing them to discard or stop using and replace them.

96.    JNJ and the other members of PhRMA and CHPA had a meeting of the minds on the object or course of the conspiracy.   This meeting of the minds was and is manifested by the actions of those associations, as alleged herein.

97.    In furtherance of this conspiracy, JNJ committed the acts alleged herein.

98.    The following actions of JNJ, among others, are unlawful overt acts in furtherance of the conspiracy.

- The deceptive and unfair actions of JNJ, through PhRMA and CHPA, to mislead consumers into disposing of medications that had passed their "expiration dates," such as the "**SMAR,T DISPOSAL**" and American Medicine Chest Challenge campaigns.

- The deceptive and unfair statements and omissions of material facts on JNJ's web sites and publications, as alleged herein.

- The omission of material facts on the packaging of JNJ's OTC medications, as alleged herein.

99.    Appropriate injunctive relief is necessary to undo the effects on Plaintiff and the Class of this civil conspiracy. If the civil conspiracy is not stopped by such injunctive relief, Plaintiff and the members of the class will continue to suffer injury by being induced to discard subject medications and spending money for replacement medication.

## **PRAYER FOR RELIEF – ALL COUNTS**

WHEREFORE, Plaintiff on behalf of himself and the Class, pray judgment against JNJ, jointly and severally, as follows:

1.    Ordering that this action may be maintained as a class action on behalf of the following Class:

> **All Missouri citizens who purchased Tylenol Cold Multi-Symptom medications for personal, family, or household purposes and who later discarded and replaced it.**
>
> Excluded from the class and subclasses are officers, directors and employees of JNJ and any entity affiliated with or controlled by JNJ, counsel and members of the immediate families of counsel for Plaintiffs herein, and the judge presiding over this action and any member of the judge's immediate family. Certifying Plaintiff as Class Representative and appointing Plaintiff's counsel as counsel for the Class;

2.    Certifying Plaintiff as Class Representative and appointing Plaintiff's counsel as counsel for the Class;

3.    Awarding appropriate equitable relief, as determined by the Court, including an order to take all steps necessary to accurately disclose the meaning of the "expiration dates" printed on the packages of the subject products; to provide accurate information as to when the subject medications are no longer stable, safe, and effective; to tell consumers how to store their medications to extend the

medications' useful lives; and to provide all applicable financial relief naturally flowing from Defendants' obligations under the injunction;

4.  Awarding Plaintiff and the Class damages as provided by law;

5.  Awarding Plaintiff and the Class punitive damages as provided by law;

6.  Awarding Plaintiff and the Class costs and reasonable attorneys' fees herein;

7.  Awarding such other and further relief as the court deems fit and proper.

Respectfully submitted,

**LAW OFFICE OF RICHARD S. CORNFELD**

By: _____

Richard S. Cornfeld, #31046
1010 Market Street, Suite 1605
St. Louis, MO 63101
(314) 241-5799
(314) 241-5788 (fax)
rcornfeld@cornfeldlegal.com

*Attorney for Plaintiff*

25

I certify and attest that the above is a true copy of the original record of the Court in case number __I 2SL- CC04021__ as it appears on file in my office.



Issued

__11/20/2012__

**JOAN M. GILMER**, Circuit Clerk
St. Louis County Circuit Court

By

_Cassidy Dobson_
Deputy Clerk

CCOPR36    Rev. 06/00